**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff,

                                  Case No. 3:70-cv-636-TJC-PDB

v.

FLAGLER COUNTY SCHOOL
DISTRICT et al.,

    Defendants.

---

**O R D E R**

This case is before the Court on the Joint Motion for Unitary Status. (Doc. 114). The Court has considered the Joint Motion, reviewed the historical record, and heard oral argument on January 14, 2026, the record of which is incorporated by reference. (Doc. 119). For the following reasons, the Joint Motion for Unitary Status is due to be granted.

## I.   BACKGROUND

On July 10, 1970, the United States filed suit against Flagler County School District, challenging its racially segregated school system.[1] On August 7, 1970, this

---

[1] At the same time, the United States filed suit against the Baker, Bradford, Pasco, Seminole, and St. Johns County school districts, docketed together with this matter. The Baker, Pasco, Seminole, and St. Johns matters are now closed. At the hearing, the United States stated that it anticipates movement in the Bradford case within the calendar year.

Court approved and ordered a plan to desegregate the District commencing with the 1970–1971 school year, and directed the District to file annual reports on its desegregation efforts. (Doc. 98-2).

On June 5, 1972, this Court issued a Consent Decree and Order, negotiated by the parties, allowing the District to reassign students in grades K–6 to a newly-constructed Bunnell Elementary School, to reassign students in grades 7–12 to a new high school, Flagler Palm Coast High School, and to close the Flagler Beach School. (Doc. 116-1). On May 7, 1980, the Court removed this action from its active docket, noting that the District retained a "duty to abide by and comply with the Court's orders," including its obligation to file annual reports. (Doc. 98-4). Between 1971 and 1988, the District regularly filed annual reports pursuant to the Court's orders. (Doc. 116, attachments).

In January 2018, the United States conducted a site visit, during which it visited each of the District's schools, including its two public charter schools, interviewed senior central office staff, and observed a quarterly meeting of the District's Coalition for Student Success. (Doc. 114 at 2).[2]

On September 25, 2024, the United States sent the District another request for information about its compliance with the Court's orders, seeking an update to

---

[2] The Coalition consists of staff, students, community members, and local law enforcement who monitor and recommend amendments to the District's student discipline policies and practices.

the previously provided information, to which the District responded on January 15, 2025. (Id. at 3). At the January 14, 2026 hearing, the United States stated that the data demonstrated the vestiges of prior de jure segregation were eliminated to the extent practicable in Flagler County Public Schools.

## II.  LEGAL STANDARD

The goal of a school desegregation case is to promptly convert a de jure segregated school system to a system without "white" schools or "black" schools, but just schools. Green v. County Sch. Bd. of New Kent Cnty., Va., 391 U.S. 430, 442 (1968). In determining whether a declaration of unitary status is appropriate, the Court considers: (1) whether the school district has fully and satisfactorily complied with the Court's decrees for a reasonable period; (2) whether the vestiges of prior de jure segregation have been "eliminated to the extent practicable"; and (3) "whether the school district has . . . demonstrated a good-faith commitment to the whole of the [C]ourt[']s decree[s] and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance." See Missouri v. Jenkins, 515 U.S. 70, 87–89 (1995) (quoting Freeman v. Pitts, 503 U.S. 467, 491–92, 498 (1992); Bd. of Educ. of Oklahoma City Pub. Sch. v. Dowell, 498 U.S. 237, 249–50 (1991)).

The Supreme Court has identified six areas, commonly known as the "Green factors," to be addressed when analyzing whether a school district has fulfilled its desegregation duties and eliminated vestiges of the prior dual system to the extent

practicable: (1) student assignment; (2) faculty; (3) staff; (4) transportation; (5) extracurricular activities; and (6) facilities. Green, 391 U.S. at 435; see Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cnty., 244 F.3d 927, 942 (11th Cir. 2001) ("For a district court to determine whether the vestiges of discrimination have been eliminated to the extent practicable, it must examine . . . the so-called Green factors[.]"). Consideration of other indicia, such as "the quality of education being offered to the white and black student populations" and student discipline, may be appropriate. Freeman, 503 U.S. at 492–93; see Lee v. Etowah Cnty. Bd. of Educ., 963 F.2d 1416, 1426 (11th Cir. 1992). The proper measure of a school district's progress toward unitary status "is the effectiveness, not the purpose" of its actions. Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 538 (1979); see also Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 25 (1971). A school district must demonstrate its "affirmative commitment to comply in good faith with the entirety of a desegregation plan," and that it has not "acted in bad faith or engaged in further acts of discrimination since the desegregation plan went into effect." Freeman, 503 U.S. at 499.

To satisfy the faculty and staff factors of the Green test, the ratio of black to white teachers and other staff assigned to each school must be "substantially the same" in comparison to the school district in its entirety. Singleton v. Jackson Mun. Separate Sch. Dist., 419 F.2d 1211, 1217–18 (5th Cir. 1970), rev'd in part sub nom, Carter v. W. Feliciana Parish Sch. Bd., 396 U.S. 290 (1970). "Substantially the

4

same" has been interpreted as allowing for up to a 15% variation in faculty and staff for each school's minority staff ratio. See Pitts by Pitts v. Freeman, 887 F.2d 1438, 1447–48 (11th Cir. 1989), rev'd on other grounds, 503 U.S. 467 (1992); see also Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305, 319 (4th Cir. 2001) (approving use of a 15% variance from districtwide proportions for assessing student assignment).

## III.   ANALYSIS

The following facts are stipulated by the parties. (Doc. 114 at 4). During the 1974–75 school year, the District operated just two schools, enrolling 1,140 students (66.4% white and 33.5% black). (Id.). Bunnell Elementary School served all students in grades K–6, of whom 467 (63.3%) were white and 271 (36.7%) were black. (Id.). Flagler Palm Coast High School served all students in grades 7–12, of whom 489 (69.7%) were white and 212 (30.2%) were black. (Id.).

By the 2017–18 school year, the District had grown considerably to eleven schools, including two high schools, two middle schools, five elementary schools, and two public charter schools. (Id. at 5). At this time, the District enrolled 13,068 students, of whom 8,031 (61.4%) were white, 1,944 (14.9%) were black, and 3,093 (23.7%) were other races.[3]  (Id.). By the 2023–24 school year, the District had grown

---

[3] Specifically, during the 2017–18 and 2018–19 school years, all but one of the District's elementary, middle, and high schools fell well within 15% of the districtwide average percentage of white and black students. See Belk, 269 F.3d at

to fourteen schools, including five high schools, two middle schools, six elementary schools, one K–8 school, and one public charter school. (Id.). Overall, the District enrolled 13,503 students, of whom 7,819 (57.9%) were white, 1,817 (13.5%) were black, and 3,867 (28.6%) were other races. (Id.).

## A.  Student Assignment

The District contends that it has a desegregated student enrollment that reflects the current overall racial composition of the District. (Id.). In support, it states that the percentage of white and black students at each school falls within 15% of the districtwide racial makeup of the District. (Id.). The District states that it has not constructed or consolidated schools in a manner that would interfere with its desegregation obligations, nor does it plan to do so. (Id.). The District maintains that it has granted and denied student transfers in compliance with the District's transfer policy and this Court's order without discriminating on the basis of race. (Id.). The District states that these transfers do not have a negative effect on desegregation in District schools. (Id.).

## B.  Faculty and Staff

---

319 (4th Cir. 2001) (approving use of +/- 15% variance from districtwide proportions for assessing student assignment); (Doc. 114 at 5). The only school that fell outside of 15% of the districtwide average percentage of white and black students was the small charter school Palm Harbor Academy, which opened in 2009. Palm Harbor Academy was an open-enrollment charter school to which any District student could apply, regardless of race, but it ultimately closed in 2018 after losing its public charter from the District due to poor academic performance by its students. (Doc. 114 at 5).

6

In July of 1970, before it integrated its schools, the District operated three schools, each of which employed racially identifiable faculties: Flagler Beach School, at which all four teachers (100%) were white; Bunnell Number 2 School, at which three teachers (19%) were white and thirteen teachers (81%) were black; and Bunnell School, at which thirty-eight teachers (95%) were white and two teachers (5%) were black. (Id. at 6). In total, the District employed sixty teachers, of whom 75% were white and 25% were black. (Id.).

By the 2023–24 school year,[4] the District employed 1,016 teachers, of whom 842 (82.9%) were white, seventy-five (75) (7.4%) were black, and ninety-nine (99) (9.7%) were other races. (Id.). The racial breakdown of teachers at each of the District's schools remained relatively unchanged during the 2024–25 school year. (Id.). During that year, the District employed 997 teachers, of whom 816 (81.8%) were white, seventy-seven (77) (7.7%) were black, and 104 (10.4%) were other races. (Id.).

By the 2024–25 school year, the District employed thirty-nine principals and assistant principals in its schools, of whom thirty-three (84.6%) were white, four (10.2%) were black, and two (2.1%) were other races. (Id.). During this year, the District employed forty-four district-level administrators, of whom twenty-eight

---

[4] The District's past and current enrollment data is available at https://www.fldoe.org/accountability/data-sys/edu-info-accountability-services/pk-12-public-school-data-pubs-reports/archive.stml.

(63.6%) were white, ten (22.7%) were black, and six (13.6%) were other races. (Id.). The District states it has recruited minority administrators, faculty, and staff and continues to do so. (Id.).

During its review of the District's compliance in 2018, and again in 2025, the United States found no evidence of discrimination in faculty and staff assignment, or in the District's other employment practices. (Id. at 6–7); see United States v. DeSoto Parish School Bd., 574 F.2d 804, 819 (5th Cir. 1978) ("Singleton does not require that [racial] ratios be maintained permanently; rather, it contemplates an initial reassignment so that the racial ratio at every school reflects the systemwide ratio, followed by the utilization of a non-discriminatory hiring, firing, and assignment policy thereafter.") (citation modified).

## C.  Transportation

The District states that it maintains non-discriminatory policies and practices with respect to transportation, and provides transportation to students in a non-segregated and non-discriminatory manner. (Doc. 114 at 7).

## D.  Extracurricular Activities

The District offers a variety of student activities, and it maintains that race is not a consideration for participation in those activities. (Id.). Student participation in sports, student government, clubs, and extracurricular and co-curricular activities reflects that activities are available to all students in the District regardless of race. (Id.).

8

### E.    Facilities

There is no evidence of discrimination in school facilities. The District assigns students to facilities in a non-segregated and non-discriminatory manner. (Id.). Each of the District's current schools reside in similar facilities that have been built within the last twenty years. (Id.).

### IV.    CONCLUSION

The foregoing analysis reveals that the District has complied with the 1970 and 1972 Orders for a reasonable period of time, and it has eliminated the vestiges of the prior de jure segregation to the extent practicable with respect to the Green factors. Based on the information provided in the Joint Motion and accompanying exhibits, the supplemental documentation submitted, the arguments of both parties at the hearing, applicable federal law, and, finding no evidence of racial discrimination in the District's current practices, it is hereby **ORDERED**:

1.  The Joint Motion for Unitary Status (Doc. 114) is **GRANTED**.

2.  The Flagler County School District is declared **UNITARY**.

3.  The Consent Decree entered as to Flagler County School District (Doc. 116-1) is hereby **DISSOLVED**.

4.  This case is **DISMISSED with prejudice** as to Flagler County School District. All prior Orders in this case pertaining to Flagler County School District are no longer in effect. Defendant Flagler County School District

9

should be terminated as a party. The file remains open, pending the resolution of the case as it relates to Bradford County School District.

**DONE AND ORDERED** in Jacksonville, Florida this 4th day of March, 2026.



TIMOTHY J. CORRIGAN
Senior United States District Judge

hms
Copies:

Counsel of record