**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BRADFORD COUNTY SCHOOL DISTRICT, et al.,**<br><br>**Defendants.** | ) | **Case No.: 3:70-CV-636-HLA-PDB** |

# JOINT MOTION FOR UNITARY STATUS

Pursuant to Federal Rule of Civil Procedure 7(b) and Local Rule 3.01, Plaintiff, the UNITED STATES OF AMERICA ("United States"), Defendant, BRADFORD COUNTY SCHOOL DISTRICT (the "District" or "Bradford County Schools"), and Intervenor Defendant, BROOKER COMMUNITY SCHOOL, INC. ("Brooker" or "Brooker Community School") (collectively, the "parties"), through their respective undersigned counsel, respectfully submit this Joint Motion for Unitary Status as follows:

## Procedural History

On July 10, 1970, the United States filed suit against the District, challenging its racially segregated school system. At the same time, the United State filed suit

against the Baker, Flagler, Pasco, Seminole, and St. Johns County school districts. The Baker, Pasco, Seminole, St. Johns, and Flagler County matters are now closed. Bradford County is the last remaining school district in an action that has carried on for 56 years.

On August 7, 1970, this Court approved and ordered a plan to desegregate the District commencing with the 1970-1971 school year and directed the District to file annual reports.

On March 29, 1976, this Court entered a follow up Consent Order changing the District's grade configuration. On May 7, 1980, the Court removed this action from its active docket, noting that the District retained a "duty to abide by and comply with the Court's orders."

Most recently, the District implemented a school consolidation and construction plan, reducing the number of elementary schools to three and abandoned a previously predominantly white elementary school. Currently, the District's schools consist of a prekindergarten center, three elementary schools, a single middle school, a single high school, and a technical college.

Concurrently, a community group opened a charter school, Brooker, which sought to intervene in this matter. (ECF 77). Following this Court's order for a response, (ECF 78), the United States and the District responded that they did not object to Brooker's request. (ECF 88, 89). The Court granted Brooker's motion to

intervene and permitted Brooker to file a motion regarding approval of the charter school. (ECF 90). A joint motion was filed by the parties to approve a Consent Order, which Order was entered on July 5, 2023. (ECF 100). The Court authorized the opening of Brooker Community Charter School under limited restrictions. *See id.* Brooker has since filed annual reports, pursuant to the terms of the Consent Order. *See* (ECF 101, 105).

During this period, the United States submitted a request for information to the District in March 2023, requesting information concerning the District's efforts at complying with its desegregation efforts. The District responded to this request by the United States. The parties worked collaboratively on this process, and the District provided information up through May 2024, pursuant to the request by the United States.

The parties have remained in discussions regarding the District's ongoing desegregation efforts and now file this Joint Motion.

## **Legal Standard**

The goal of a school desegregation case is to promptly convert a *de jure* segregated school system to a system without "white" schools or "black" schools, but just schools. *Green v. Cnty. Sch. Bd. of New Kent Cnty., Va.*, 391 U.S. 430, 442 (1968). To obtain a declaration of unitary status, the District must show that its schools have: (1) fully and satisfactorily complied with the Court's decrees for a reasonable period

of time; (2) eliminated the vestiges of prior *de jure* discrimination to the extent practicable; and (3) demonstrated a good-faith commitment to the whole of the Court's decrees and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance. *Missouri v. Jenkins,* 5151 U.S. 70, 87-89 (1995); *Freeman v. Pitts*, 503 U.S. 467, 491-92, 498 (1992); *Bd. of Educ. of Oklahoma City Pub. Sch. v. Dowell*, 498 U.S. 237, 248-59 (1991).

The Supreme Court has identified six (6) areas, commonly known as the "*Green* factors," that must be addressed as part of the determination of whether a school district has fulfilled its desegregation duties and eliminated vestiges of the prior dual system to the extent practicable: (1) student assignment; (2) faculty; (3) staff; (4) transportation; (5) extracurricular activities; and (6) facilities. *Green*, 391 U.S. at 435; *see Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cnty.*, 244 F.3d 927, 942 (11th Cir. 2001). The proper measure of a district's progress toward unitary status "is the effectiveness, not the purpose, of its actions." *Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 538 (1979). To that end, a district must demonstrate its "affirmative commitment to comply in good faith with the entirety of the desegregation plan," and that it has not "acted in bad faith or engaged in further acts of discrimination since the desegregation plan went into effect." *Freeman*, 503 U.S. at 499.

It should also be noted that, "[f]rom the very first, federal supervision of local

school systems was intended as a temporary measure to remedy past discrimination." *Dowell*, 498 U.S. at 247. This is the case partly because "[n]o single tradition in public education is more deeply rooted than local control over the operation of schools," *Milliken v. Bradley*, 418 U.S. 717, 741 (1974), and also because it was never the purpose of the federal courts' desegregation jurisprudence to "condemn a school district, once governed by a board which intentionally discriminated, to judicial tutelage for the indefinite future." *Dowell*, 498 U.S. at 249.

When local school authorities demonstrate that they have complied in good faith with a district court's desegregation decree and that vestiges of their prior illegal racial discrimination have been eliminated to the extent practicable, the school system has attained unitary status and the court must return control over the school system to the local school authorities. *Lee v. Talladega Cnty. Bd. of Educ.*, 963 F.2d 1426, 1430 (11th Cir. 1992).

**<u>Stipulated Facts</u>**

Pursuant to the Court's previous endorsed order, (ECF 115), the undersigned have attempted to retrieve the annual reports and other pertinent filings related to this matter. The undersigned have contacted the Clerk of Court, staff at the Atlanta Federal Records Center, and staff at the National Archives and Records Administration. Despite the parties' best efforts and that of the staff referred to, the undersigned were unable to specifically locate these records as the various entities

at which the records regarding this matter may be housed were unable to narrow down where, exactly, these records were housed or confirm that records relating to the District were amongst the historical records. As shown herein, however, the District has complied and continues to comply with its desegregation obligations.

### A. Student Assignment

Table 1 below shows the racial breakdown of students in Bradford County Schools for the 1967-1968 school year (before the United States' desegregation of enforcement was commenced) approximated to the nearest percentage[1]:

Table 1

| **School** | **Grades** | **Black** | **White** |
|---|---|---|---|
| Anderson Junior High School | K-8 | 100% | 0 |
| Brooker Junior High School | K-8 | 0 | 100% |
| Hampton Elementary School | K-6 | 8% | 92% |
| Lawtey Elementary School | K-6 | 3% | 97% |
| R. J. E. Grade School | K-12 | 100% | 0 |
| Southside Elementary School | K-5 | 9% | 91% |
| Starke Elementary School | K5 | 20% | 80% |
| Bradford Middle School | 6-8 | 12% | 88% |
| Bradford County High School | 9-12 | 12% | 88% |
| **District-wide Total Population:** | | **27%** | **73%** |

[1]Data gathered from archival charts within the Department of Justice.

By favorable contrast, Table 2 below shows the racial breakdown of students in Bradford County Schools in the 2025-2026 school year, per the Florida Department of Education, approximated to the nearest percentage[2]:

Table 2

| **School** | **Grades** | **Black** | **White** | **Hispanic** | **Other** |
|---|---|---|---|---|---|
| Bradford Elementary School | PK-6 | 25% | 55% | 10% | 10% |
| Lawtey Elementary School | PK-6 | 14% | 78% | 3% | 5% |
| Starke Elementary | PK-6 | 24% | 61% | 6% | 9% |
| Bradford Middle School | 7-8 | 23% | 60% | 6% | 11% |
| Bradford High School | 9-12 | 27% | 59% | 6% | 8% |
| **District-wide Total:** | | **23%** | **61%** | **7%** | **9%** |

More specifically, as of December 19, 2025, the District's total student population was 2,838, including students attending Brooker. Of this total student population, 6 students were American Indian or Alaskan Native (0.2%), 19 were Asian or Pacific Islander (0.7%), 649 were Black, Non-Hispanic (22.9%), 186 were Hispanic (6.6%), 229 were Multiracial (8.1%), and 1,749 were White, Non-Hispanic (61.6%).[3]

As shown by Table 2 and the data herein, the District maintains a

[2] https://edudata.fldoe.org/AdvancedReports_Tableau.html?StudentEnrollments=true.

[3] Percentages have been rounded up to the nearest tenth of a point.

desegregated student enrollment that corresponds with the current overall racial composition of the District within judicially acceptable deviations.

Courts have found that when no racial group deviates by more than 20 percentage points from a District-wide average in any school, the school system is considered desegregated. *United States v. State of Ga., Meriwether Cnty.*, 171 F.3d 1333, 1338 (11th Cir. 1999). The District falls well within this benchmark in all of its schools. This represents elimination of the vestiges of prior *de jure* segregation to the extent practical.

The District has not constructed or consolidated schools in a manner that would interfere with its desegregation obligations, nor does it plan to do so, and the Brooker Community School has complied in all respects with this Court's 2023 Consent Order. The District's newest school, Bradford Elementary School, complies in all respects with this Court's orders. The District has granted and denied student transfers in compliance with the District's transfer policy and this Court's order without discriminating on the basis of race. These transfers do not have a negative effect on desegregation in District schools.

## B. Faculty and Staff Assignment

In July of 1970, before it integrated its schools, the District operated 9 schools, each of which employed racially identifiable faculties[4]:

[4]Data gathered from archival charts within the Department of Justice.

| **School** | **Grades** | **Black teachers** | **White teachers** |
|---|---|---|---|
| Anderson Junior High School | K-8 | 100% | 0 |
| Brooker Junior High School | K-8 | 0 | 100% |
| Hampton Elementary School | K-6 | 0 | 100% |
| Lawtey Elementary School | K-6 | 0 | 100% |
| R. J. E. Grade School | K-12 | 100% | 0 |
| Southside Elementary School | K-5 | 10% | 90% |
| Starke Elementary School | K5 | 9% | 91% |
| Bradford Middle School | 6-8 | 11% | 89% |
| Bradford County High School | 9-12 | 2% | 95% |
| **District-wide Total Population:** | | **22%** | **77%** |

According to the Florida Department of Education, by the 2025-2026 school year, the District's 5 schools employed 175 teachers, of whom 145 (83%) were white, 27 (15%) were black, and 3 (2%) were other races.[5] The total number of instructional staff was 214, of whom 181 (85%) were white, 30 (14%) of whom were black, and 3 (1%) of whom were other.

At the same time, the District employed 24 District-level administrators, of whom 23 (96%) were white, 1 (4%) were black, and none were other races. Of the

[5]https://www.fldoe.org/accountability/data-sys/edu-info-accountability-services/pk-12-public-school-data-pubs-reports/staff.stml.

administrative staff, there were 7 principals, all of whom were white; and 4 assistant principals, 1 (25%) of whom was black, and 3 (75%) of whom were white.

More specifically, as of December 19, 2025, the District employed 202 instructional staff, of whom 1 was American Indian or Alaskan Native (0.5%), 1 was Asian or Pacific Islander (0.5%), 28 were Black, Non-Hispanic (13.9%), 1 was Hispanic (0.5%), and 171 were White, Non-Hispanic (84.7%). The District employed 9 administrative principals or assistant principals, of whom 1 was Black, Non-Hispanic (11.1%), and 8 were White, Non-Hispanic (88.9%). The District employed 21 District administrative staff, of whom 2 were Black, Non-Hispanic (9.5%), and 19 were White, Non-Hispanic (90.5%).[6]

The District has recruited minority administrators, faculty, and staff and continues to do so. During its review of the District's compliance, the United States found no evidence of discrimination in faculty and staff assignment, or in the District's other employment practices.[7] The District should therefore be declared unitary with regard to faculty and staff assignment.

### C. Transportation

The District maintains non-discriminatory policies and practices with respect

[6] All percentages rounded to the nearest tenth of a point.

[7] *See United States v. DeSoto Parish School Bd.*, 574 F. 2d 804, 819 (5th Cir. 1978) ("*Singleton* does not require that [racial] ratios be maintained permanently; rather, it contemplates an initial reassignment so that the racial ratio at every school reflects the systemwide ratio, followed by the utilization of a non-discriminatory hiring, firing, and assignment policy thereafter." (internal quotation marks omitted)).

to transportation and provides transportation to students in a non-segregated and non-discriminatory manner.

### D. Extracurricular Activities

The District offers a wide variety of student activities, and race is not a consideration for participation in those activities. Student participation in activities, including clubs, student government, sports, and other extracurricular and co-curricular activities, reflects that activities are available to all students in the District regardless of race.

### E. Facilities

There is no evidence of discrimination in school facilities; the District assigns students to facilities in a non-segregated and non-discriminatory manner. Indeed, each of the District's current schools reside in similar facilities that have been built within the last 20 years, aside from Bradford Elementary School which formally opened in the 2023-2024 school year. Like the other facilities in the District, there is no evidence of discrimination at Bradford Elementary School.

### F. The Intervenor Defendant

Brooker is a public charter school located within the District. In exercising jurisdiction over charter schools in desegregation cases, courts examine whether the proposed school would impede the school district's desegregation efforts and may impose conditions on the charter school's operation if necessary. *Smith v. Sch. Bd. of*

*Concordia Parish*, 906 F. 3d 327, 331-32 (5th Cir. 2018); *Berry v. Sch. Dist. of Benton Harbor*, 56 F. Supp. 2d 866, 879 (W.D. Mich. 1999); *Cleveland v. Union Parish Sch. Bd.*, 570 F. Supp. 2d 858, 867 (W.D. La. 2008). Brooker Community School is operated by a private nonprofit and opened to the public only after seeking and obtaining approval from this Court. As a public charter school, Brooker Community School is a school of choice and operates under a race-neutral admissions rules. The school is subject to Florida's open enrollment laws as well as section 1002.33(10)(e), Florida Statutes, pertaining specifically to charter school enrollment. Any student may apply for enrollment and will be accepted if there is available space. In accordance with section 1002.33(10), Florida Statues, the school conducts a random lottery in the event the number of students in any grade level exceeds the number of applicants. § 1002.33(10(b), Fla. Stat. ("The charter school shall enroll an eligible student who submits a timely application, unless the number of applications exceeds the capacity of a program, class, grade level, or building. In such case, all applicants shall have an equal chance of being admitted through a random selection process."). Brooker is also bound by the anti-discrimination requirements set forth in section 1000.05, Florida Statutes, prohibiting discrimination on the basis of race, color, national origin, sex, disability, religion, or marital status against a student or an employee.

The charter school is located in an area of Bradford County with an

approximately 90% white population as of the most recent U.S. Census data. For the 2025-26 school year, Brooker had an enrollment of 99 students with a composition as follows: 88 white students, 1 black student, and 10 students of another race or mixed race. The charter school's population is representative of the surrounding community. Brooker has reported each year since the Court issued its Order on July 5, 2023, (ECF 100), on its annual recruitment efforts. Brooker Community School has not impeded the District's efforts to eliminate the vestiges of past *de jure* discrimination.

## CONCLUSION

Based on the foregoing information and data and on all the surrounding facts, the parties respectfully submit that the District has complied with the Court's desegregation orders for a reasonable period of time and has eliminated the vestiges of past *de jure* discrimination to the extent practicable. The parties conclude, therefore, that the District has met the legal standards for a declaration of unitary status, and that it is entitled to dismissal of this action.

**WHEREFORE**, the parties, the United States, the District, and Brooker, respectfully request that the Court enter an order declaring the BRADFORD COUNTY SCHOOL DISTRICT unitary, dissolving all prior injunctions against the District, terminating jurisdiction, dismissing this case with prejudice, and requesting that this case be closed as it applies to Defendant BRADFORD COUNTY

SCHOOL DISTRICT and Intervenor Defendant BROOKER COMMUNITY SCHOOL.

Respectfully submitted on this 29th day of May, 2026.

*For Plaintiff United States of America:*

/s/ Peter Feaman
PETER FEAMAN
Senior Counsel
Florida Bar No. 260347
Harmeet K. Dhillon
Assistant Attorney General
**UNITED STATES OF AMERICA**
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Phone: (202) 532-4475
Email: Peter.Feaman@usdoj.gov
*Counsel for Plaintiff*

*For Defendant Bradford County School District:*

/s/ Jeffrey J. Grosholz
JEFFREY J. GROSHOLZ
**RUMBERGER, KIRK & CALDWELL, P.A.**
Florida Bar Number: 1018568
101 N. Monroe St., Ste. 1050
Tallahassee, FL 32301
Phone: (850) 222-6550
E-mail: jgrosholz@rumberger.com
pstolba@rumberger.com
*Counsel for Defendant*

/s/ Braxton A. Padgett
BRAXTON A. PADGETT
**THE ARNOLD LAW FIRM LLC**
Florida Bar No. 1002528
3840 Crown Point Rd, St. B
Jacksonville, FL 32257
Phone: (904) 731-3800
Email: braxton@arnoldlawfirmllc.com
*Counsel for Intervenor Defendant*