**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

Case No. 3:70-cv-636-TJC-PDB

v.

BRADFORD COUNTY SCHOOL DISTRICT, et al.,

Defendants.

---

**ORDER**

This case is before the Court on the Joint Motion for Unitary Status. (Doc. 125). The Motion asks the Court to declare that Defendant Bradford County School District ("the District") has reached unitary status and is entitled to dismissal of this action. The Court has considered the Motion, reviewed the historical record, and heard argument on July 29, 2026. The Court is prepared to rule.

**I. Background**

On July 10, 1970, the United States filed suit against the District, challenging its racially segregated school system.[1] On August 7, 1970, this Court

[1] At the same time, the United States filed suit against the Baker, Flagler, Pasco, Seminole, and St. Johns County school districts, docketed together with this matter. Those matters are now closed.

approved and ordered a plan to desegregate the District commencing with the 1970–1971 school year, and directed the District to file annual reports on its desegregation efforts. (Doc. 98-2). On March 29, 1976, this Court entered a follow-up order changing the District's grade configuration. (Doc. 98-3). On May 7, 1980, the Court removed this action from its active docket, noting that the District retained a "duty to abide by and comply with the Court's orders." (Doc. 98-4).

Recently, the District implemented a school consolidation and construction plan, reducing the number of elementary schools to three. Currently, the District's schools consist of a prekindergarten center, three elementary schools, a single middle school, a single high school, and a technical college.[2] In 2023, a community group sought to open a charter school, Brooker Community School, Inc. ("Brooker"). Brooker sought to intervene in this matter, which was unopposed. (Doc. 77, 88, 89). The Court granted Brooker's motion to intervene and permitted Brooker to file a motion regarding approval of the charter school. (Doc. 90). On July 5, 2023, the Court entered a Consent Order authorizing Brooker to open under certain restrictions and requirements. (Doc. 100). Brooker has since filed annual reports, pursuant to the Consent Order. (Docs. 101, 105, 126).

At the July 29, 2026 hearing, the parties argued that the data demonstrated

---

[2] In March 2023, the United States requested information from the District concerning the District's efforts at complying with its desegregation efforts. The parties worked collaboratively on this information-gathering process, and the District provided information through May 2024.

the vestiges of de jure segregation were eliminated to the extent practicable in the District. The Court agreed that without Brooker, the District achieved unitary status. The Court questioned the parties about the racial disparities at Brooker and whether Brooker's enrollment was consistent with the Court's prior Consent Order. Having considered the record and the parties' submissions, however, and for the reasons set forth in greater detail below, the Court finds that Brooker's current enrollment composition has not impeded the District's desegregation efforts and does not preclude a declaration of unitary status for the District as a whole.

**II. Legal Standard**

The goal of a school desegregation case is to promptly convert a de jure segregated school system to a system without "white" schools or "black" schools, but just schools. Green v. County Sch. Bd. of New Kent Cnty., Va., 391 U.S. 430, 442 (1968). In determining whether a declaration of unitary status is appropriate, the Court considers: (1) whether the school district has fully and satisfactorily complied with the Court's decrees for a reasonable period; (2) whether the vestiges of prior de jure segregation have been "eliminated to the extent practicable"; and (3) whether the school district has demonstrated a good-faith commitment to the whole of the Court's decrees and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance. Missouri v. Jenkins, 515 U.S. 70, 87–89 (1995) (quoting Freeman v. Pitts, 503 U.S. 467, 491–92, 498 (1992); Bd. of Educ. of Oklahoma City Pub. Sch. v. Dowell, 498 U.S. 237,

249–50 (1991)).

The Supreme Court has identified six areas, commonly known as the "Green factors," to be addressed when analyzing whether a school district has fulfilled its desegregation duties and eliminated vestiges of the prior dual system to the extent practicable: (1) student assignment; (2) faculty; (3) staff; (4) transportation; (5) extracurricular activities; and (6) facilities. Green, 391 U.S. at 435; see also Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cnty., 244 F.3d 927, 942 (11th Cir. 2001) ("For a district court to determine whether the vestiges of discrimination have been eliminated to the extent practicable, it must examine . . . the so-called Green factors[.]"). Consideration of other indicia, such as "the quality of education being offered to the white and black student populations" and student discipline, may be appropriate. Freeman, 503 U.S. at 492–93; Lee v. Etowah Cnty. Bd. of Educ., 963 F.2d 1416, 1426 (11th Cir. 1992). When considering the Green factors, courts often assess whether any school's demographics differ markedly from the district-wide ratio. For example, in determining whether the student assignment factor has been satisfied, Courts have approved the use of a "20% deviation figure." See, e.g., United States v. State of Ga., Meriwether Cnty., 171 F.3d 1333, 1338 (11th Cir. 1999). As to the faculty and staff factors, the ratio of Black to White teachers and other staff assigned to each school must be "substantially the same" in comparison to the school district in its entirety. Singleton v. Jackson Mun. Separate Sch. Dist., 419 F.2d 1211, 1217–18 (5th Cir. 1970), rev'd in part sub nom. Carter v.

W. Feliciana Parish Sch. Bd., 396 U.S. 290 (1970). "Substantially the same" has been interpreted as allowing for up to a 15% variation in faculty and staff for each school's minority staff ratio. See Pitts by Pitts v. Freeman, 887 F.2d 1438, 1447–48 (11th Cir. 1989), rev'd on other grounds, 503 U.S. 467 (1992).

However, "[t]he Supreme Court has recognized that some racial imbalances in . . . schools today are caused by external forces, such as demographic shifts, which are not the result of segregation and which are beyond a school board's control." N.A.A.C.P., Jacksonville Branch v. Duval Cnty. Sch., 273 F.3d 960, 966 (11th Cir. 2001) (citing, inter alia, Jenkins, 515 U.S. at 102); see also Manning, 244 F.3d at 941. Thus, even if supposedly "racially identifiable" or "racially imbalanced" schools remain, the "critical factual question" is whether these racial imbalances are caused by a school district's "past de jure segregation (or other discriminatory conduct), or whether, instead, the racial imbalances [are] caused by nondiscriminatory factors and circumstances." Manning, 244 F.3d at 936. A school district must demonstrate its "affirmative commitment to comply in good faith with the entirety of the desegregation plan," and that it has not "acted in bad faith or engaged in further acts of discrimination since the desegregation plan went into effect." Freeman, 503 U.S. at 499.

"From the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination." Dowell, 498 U.S. at 247. This is the case partly because "[n]o single tradition in public education is more

deeply rooted than local control over the operation of schools," Milliken v. Bradley, 418 U.S. 717, 741 (1974), and also because it was never the purpose of the federal courts' desegregation jurisprudence to "condemn a school district, once governed by a board which intentionally discriminated, to judicial tutelage for the indefinite future." Dowell, 498 U.S. at 249.

"When local school authorities demonstrate that they have complied in good faith with the district court's desegregation decree and that the vestiges of their prior illegal racial discrimination have been eliminated to the extent practicable—in short, that their school system has attained unitary status—the court should and must return control over their school system to the local school authorities." Lee v. Talladega Cnty. Bd. of Educ., 963 F.2d 1426, 1430 (11th Cir. 1992) (citation omitted).

## III. Analysis

### A. Student Assignment

During the 1967–1968 school year (prior to commencement of the United States' action), the District operated nine schools, with a District-wide population of approximately 73% White students and 27% Black students. (Doc. 125 at 6). These schools were largely, if not entirely, racially segregated. (Id.).

By the 2025–2026 school year, however, the District operated five schools, not including Brooker, with a District-wide population of approximately 61% White students, 23% Black students, and the balance being of other races. (Id. at 7). None

of the District's schools are racially segregated and all fall within the acceptable racial variation percentages. (Id.). The Court thus finds that the District's student assignment across its schools corresponds with the current overall racial composition of the District, within judicially acceptable deviations. Manning, 244 F.3d at 935–36; see also Meriwether Cnty., 171 F.3d at 1338. This represents elimination of the vestiges of prior de jure segregation to the extent practicable.

The Court also finds the District has not constructed or consolidated schools in a manner that would interfere with its desegregation obligations, and accepts the parties' representations that the District does not plan to do so. (Doc. 125 at 8). Moreover, the District has represented it has granted and denied student transfers in compliance with the District's transfer policy and this Court's orders without discriminating on the basis of race. (Id.). These transfers do not have a negative effect on desegregation in District schools. Therefore, the Court finds the District has satisfied the student assignment factor.

**B. Faculty and Staff Assignment**

In July 1970, before it integrated its schools, the District operated nine schools, each of which employed racially identifiable faculties that were nearly entirely or wholly segregated. (Id. at 8–9).

By the 2025–2026 school year, the District's schools employed 175 teachers, of whom 145 (83%) were White, 27 (15%) were Black, and 3 (2%) were other races. (Id. at 9). The total number of instructional staff was 214, of whom 181 (85%) were

White, 30 (14%) of whom were Black, and 3 (1%) of whom were other races. (Id.). The District employed 24 District-level administrators, of whom 23 (96%) were White, 1 (4%) were Black, and none were other races. Of the administrative staff, there were 7 principals, all of whom were White; and 4 assistant principals, 1 (25%) of whom was Black, and 3 (75%) of whom were White. (Id. at 9–10).

The parties represent that the District has recruited minority administrators, faculty, and staff, and continues to do so. (Id. at 10). During its review of the District's compliance, the United States found no evidence of discrimination in faculty and staff assignment, or in the District's other employment practices, and the Court discerns none. (Id.). See also United States v. DeSoto Parish School Bd., 574 F.2d 804, 819 (5th Cir. 1978) ("Singleton does not require that [racial] ratios be maintained permanently; rather, it contemplates an initial reassignment so that the racial ratio at every school reflects the systemwide ratio, followed by the utilization of a nondiscriminatory hiring, firing, and assignment policy thereafter.") (quotation modified). Based on these findings and representations, the Court finds the District has satisfied the faculty and staff factors.

**C. Transportation**

The parties submit the District maintains nondiscriminatory policies and practices with respect to transportation and provides transportation to students in a non-segregated and nondiscriminatory manner. (Doc. 125 at 10–11). The Court accepts these representations and finds the District has satisfied this factor.

**D. Extracurricular Activities**

The parties submit the District offers a wide variety of student activities, and race is not a consideration for participation in those activities. (Id. at 11). Student participation in activities, including clubs, student government, sports, and other extracurricular and co-curricular activities, reflects that activities are available to all students in the District regardless of race. (Id.). The Court accepts these representations and finds the District has satisfied this factor.

**E. Facilities**

The parties agree there is no evidence of discrimination in school facilities. The District assigns students to facilities in a non-segregated and nondiscriminatory manner. (Id.). Indeed, each of the District's current schools reside in similar facilities that have been built within the last 20 years, aside from Bradford Elementary School, which formally opened in the 2023–2024 school year. (Id.). The parties state that, like the other facilities in the District, there is no evidence of discrimination at Bradford Elementary School. (Id.). The Court accepts these representations and finds the District has satisfied the facilities factor.

**F. Brooker, the Intervenor-Defendant**

As noted, Brooker operates a public charter school located within the District known as Brooker Community School. As a public charter school, Brooker Community School is not a zoned school for which students are automatically designated for enrollment. Rather, parents must choose to enroll their students at

the charter school.

Although the District serves as the charter school's sponsor and exercises regulatory oversight, the District does not manage or maintain control over its policies, day-to-day operations, hiring practices, recruitment efforts, or other business practices. Fla. Stat § 1002.33(5)–(7). Instead, the affairs of the charter school are managed by a private nonprofit corporation and its independent governing board and administrative personnel. Id. See also Vickaryous v. Mason Classical Acad., Inc., No. 2:21-cv-903-JLB-NPM, 2022 WL 8216876, at *1 n.1 (M.D. Fla. 2022) ("[C]harter schools . . . are defined by a charter-school statute to be 'public schools.' See Fla. Stat. § 1002.33. Still, charter schools are not the same as public schools. Unlike a county school district, a charter school—as a corporate entity—has both directors and officers who may have separate capacities."), report and recommendation adopted, 2022 WL 4463560 (M.D. Fla. 2022); White v. Sch. Bd. of Hillsborough Cnty., No. 8:06-cv-1626-JDW-MAP, 2008 WL 227990, at *4 (M.D. Fla. 2008) ("Charter schools are subject to significant oversight by the school district in which they are located. . . . [However,] individuals or groups of individuals who contract their services to the charter school are not public employees.") (quotation modified), aff'd, No. 08-10922, 2009 WL 174944 (11th Cir. 2009).

Brooker Community School is located in an area of Bradford County that is approximately 90% White, according to recent United States Census data. (Doc.

125 at 12–13). For the 2025–2026 school year, the school had an enrollment of 99 students with a composition of 88 White students, 1 Black student, and 10 students of another race or mixed race. (Id. at 13). Brooker has filed annual reports on its efforts to recruit non-White students each year since the Court issued its Consent Order. (Docs. 101, 105, 126). The parties submit that Brooker Community School's population is representative of the surrounding community and the school has not impeded the District's efforts to eliminate the vestiges of past de jure discrimination. (Doc. 125 at 13). At the July 29 hearing, the Court expressed some concern over Brooker Community School's racial disparities, and whether this prevented the Court from declaring the District unitary. For the following reasons, the Court is satisfied that the school does not prevent the District from being declared unitary.

In exercising jurisdiction over charter schools in desegregation cases, courts examine whether the proposed school would impede the school district's desegregation efforts and may impose conditions on the charter school's operation, if necessary. See Smith v. Sch. Bd. of Concordia Par., 906 F.3d 327, 331–32 (5th Cir. 2018); United States v. Lincoln Par. Sch. Bd., No. 66-12071, 2016 WL 4146148, at *6 (W.D. La. Aug. 4, 2016) ("[T]he Court's role is limited to whether operation of the public charter school would undermine desegregation and promote resegregation."). The presence of racial disparities does not, on its own, undermine a finding of unitary status, especially when the disparities "have their own

independent causes," and are not "vestiges of the prior unconstitutional de jure system." United States by Katzenbach v. Dyersburg Bd. of Educ., No. 2:66-cv-241-SHL, 2026 WL 382900, at *3 (W.D. Tenn. Feb. 11, 2026) (quoting Robinson v. Shelby Cnty. Bd. of Educ., 566 F.3d 642, 653 (6th Cir. 2009)). The ultimate inquiry is not whether a particular school exhibits racial imbalance, but whether any existing imbalance is causally connected to the former de jure system, results from discriminatory conduct, or otherwise impedes the District's efforts to eliminate the vestiges of past segregation to the extent practicable. Freeman, 503 U.S. at 494–96; Manning, 244 F.3d at 936, 941.

The record does not show that Brooker Community School's current enrollment composition is causally connected to the former de jure system, that it is attributable to discriminatory conduct by the District, or that the school's operation has undermined the District's desegregation efforts. The school has operated pursuant to race-neutral enrollment procedures, has complied with the reporting requirements imposed by the Consent Order, and has undertaken recruitment efforts intended to broaden awareness of the school throughout the surrounding community. (Docs. 101, 105, 126). Indeed, Brooker's annual reports demonstrate good-faith and substantial compliance with its recruitment, outreach, transportation, and reporting obligations under the Consent Order.

Moreover, a school district that "has shifted . . . from one of separate schools and separate programs, to one in which all students of the same grade attend the

same schools and may join the same programs" militates in favor of finding unitary status. Katzenbach, 2026 WL 382900, at *3. Indeed, "the most persuasive argument for the remediation of de jure segregation is that all students of the same grade" attend the same school. Id. Brooker Community School serves students only in grades pre-kindergarten through grade six. In Bradford County, all public school students must attend the same middle school and the same high school (Bradford Middle and Bradford High).

The Court acknowledges that Brooker Community School has fallen short of the Consent Order's requirement that its student enrollment demographics not deviate by more than 15% from that of the District's overall elementary enrollment. (Doc. 100 at 18). While the Court does not minimize this fact, the evidence does not establish a causal connection between those enrollment figures and the constitutional violation at issue in this case. Rather, the record reflects that Brooker's enrollment is the product of present-day demographic factors and parental choice, not a continuation of the District's former dual school system. Consequently, Brooker Community School's current racial disparities do not prohibit a finding of unitary status here.[3]

[3] The Court also finds it appropriate to dissolve the Consent Order as to Brooker Community School (Doc. 100), in part because it remains bound by Florida open enrollment and nondiscrimination laws. The school is subject to Florida's open enrollment laws as well as the laws specifically governing charter schools and student enrollment therein. (Doc. 125 at 11–12); see also Fla. Stat. §§ 1002.31, 1002.33. The school is also bound by the anti-discrimination requirements set forth

## IV. Conclusion

The District has complied with the Court's desegregation Orders for a reasonable period of time, and it has eliminated the vestiges of the prior de jure segregation to the extent practicable with respect to the Green factors. Brooker's disparities, while noted by the Court, do not prevent this finding, especially when placed in context of the District's entire student assignment ratios.

Therefore, based on the information provided in the Motion and accompanying information, documentation submitted, the arguments and submissions of the parties, applicable federal law, and, finding no evidence of racial discrimination in the District's current practices, it is hereby **ORDERED**:

1. The Joint Motion for Unitary Status (Doc. 125) is **GRANTED**. Bradford County School District is declared **UNITARY**.
2. The Consent Decree entered as to Bradford County School District (Docs. 98-2, 98-3) is hereby **DISSOLVED**.
3. The Consent Order entered as to Brooker Community School, Inc. (Doc. 100) is hereby **DISSOLVED**. The Court encourages Brooker to continue its outreach programs to potential students, faculty, and staff.
4. This case is **DISMISSED with prejudice** as to Defendant Bradford

in Fla. Stat. § 1000.05, prohibiting discrimination on the basis of race, color, national origin, sex, disability, religion, or marital status against any student or employee. Nonetheless, the Court encourages Brooker to continue its outreach efforts.

County School District and Intervenor-Defendant Brooker Community School, Inc., and all prior Orders in this case pertaining to Defendants are no longer in effect.

5. The Clerk shall terminate Defendant Bradford County School District and Intervenor-Defendant Brooker Community School, Inc. as parties, terminate any pending motions and deadlines, and close the file.

**DONE AND ORDERED** in Jacksonville, Florida this 9th day of October, 2026.

Timothy J. Corrigan
TIMOTHY J. CORRIGAN
Senior United States District Judge

hms
Copies:

Counsel of record